# Nancy M. Tricamo, LCSW

**Mitigation and Sentencing Specialist**
49 West 24th Street – Suite 1006
New York, NY  10010
646-528-4568
ntricamo@mac.com

---

March 1, 2019
Troy A. Smith, Esq.
Attorney at Law, PC
200 Mamaroneck Ave- – Suite 401
White Plains, NY 10601


Re:     United States of America v. *Richard Laugel*


### Psychosocial Assessment

This report is submitted on behalf of Richard Laugel. Mr. Laugel's case is scheduled to be before the Court on March 20, 2019.  The purpose of this report is to provide the Court with background and current information about Richard Laugel in order to aid the Court in making a fair and proper decision when sentencing Richard Laugel.

In preparation of this report a thorough background investigation of Mr. Laugel was conducted that included an interview with Richard and a review of his military, medical and other records.  In addition, Tania Jackson, Mr. Laugel's wife was interviewed. The case was discussed at length with defense counsel, Troy A. Smith, Esq. and all pertinent legal materials were reviewed.  Finally, relevant research was conducted on behalf of Mr. Laugel.

The defense is aware of the serious nature of the crimes that Mr. Laugel is charged with and our report is not meant to minimize his behavior.  Instead, we seek to understand Mr. Laugel's actions in the context of his history and other pertinent factors and sentence him according to this understanding.

The details of the exact charges against Mr. Laugel will not be discussed in this correspondence. None of the information contained in this report is intended to address Mr. Laugel's alleged offense behavior or to be used as an admission or denial of guilt. The sole purpose of this correspondence is to address the reasons why Mr. Laugel should be considered for leniency in sentencing.

**RELEVANT PERSONAL HISTORY**

Richard Laugel, III was born in Belleville, New Jersey on November 24, 1979. He is one of two children produced by the union of Sharon Laugel (nee Nelson) and Richard Laugel, Jr. Both of Mr. Laugel's parents are deceased. His mother, Sharon Laugel died in 2004 from cancer. Mr. Laugel was deployed with the Marines in Iraq at the time of his mother's death and he was unable to attend her funeral. His father, Richard Laugel, Jr. died in 2001 due to alcohol related illness. Richard's sister, Courtney Laugel is four years younger than Richard and resides in New Mexico. She was incarcerated for battery charges in 2014 when she and two others brutally beat a man she claimed had raped her several days earlier. Richard believes his sister struggles with drug addiction and that this was not her first arrest. They have not spoken in over ten years.

Richard Laugel was raised in Kearny New Jersey. He lived with both of his parents until they separated in 1993, when he was a young teenager. His father then moved to Bronx, New York and his mother remained in New Jersey. Mr. Laugel describes his father as a "troubled guy" who was a severe alcoholic. He reports his father could not maintain steady employment and engaged in illegal activities, loan sharking and gambling, in order to support himself.  He reports his father was incarcerated in the 1980's, but is not aware of the charges against him. His memory is that he was gone for a couple of years.

Richard's memories of the time his parents were together are troubled and turbulent. He remembers his father drinking daily to the point of intoxication and him being an "angry drunk." On many occasions, his father became physically violent with Richard's mother, as well as with Richard and his sister. These incidents were traumatic for Richard and his sister, not only because they feared for their safety but also because they were helpless to do anything to protect their mother. The American Family Physician states the following about children who witness domestic violence in their homes:

> *These children are at greater risk for internalized behaviors such as anxiety and depression, and for externalized behaviors such as fighting, bullying, lying, or cheating. They also are more disobedient at home and at school, and are more likely to have social competence problems, such as poor school performance and difficulty in relationships with others. Child witnesses display inappropriate attitudes about violence as a means of resolving conflict and indicate a greater willingness to use violence themselves.*[1]

Not long before his parents separated, Richard has a vague memory about there being an investigation by child protective services surrounding marks found on his sister or himself from beatings by his father. He believes this was the catalyst for his mother to separate from his father. When his father left the home and went to the Bronx, however,

---

[1] https://www.aafp.org/afp/2002/1201/p2052.html

Richard and his sister continued to visit with him regularly, without the supervision of their mother. He continued to drink and be abusive toward Richard and his sister.

Richard's mother, Sharon Laugel, worked as a teacher in the Kearny public school system in New Jersey for all of her adult career. She worked with special education students and Richard remembers her reputation in the school as being a very well respected teacher. Richard did spend most of this time with his mother following his parent's divorce, and was close to her. She was diagnosed with cancer while he was deployed with the Marines in Iraq in 2004 and died not long after being diagnosed. Richard was unable to attend services for his mother, and was not informed she had died until he returned from Iraq months later. This is a fact that torments Richard, and does not allow for closure surrounding her loss.

Richard Laugel's grandfathers were role models to him regarding their service to their country. Richard Laugel, Sr, his paternal grandfather served in the Army and was a decorated service member. He died in 2010 at the age of eighty-seven, outliving Richard's father, his son.  As was stated in his obituary:

> *His father died when he was an infant. As a young man, he was forced to leave high school in the 1930s in order to support his family. He then joined the U.S. Army in 1943 and was a decorated soldier. A corporal, Mr. Laugel was a part of the 491st Anti-aircraft Artillery Battalion. He fought in Africa and entered France on D-4 Day. He saw combat across France, Belgium and Germany. He received the European-African-Middle Eastern Medal, the World War II Victory Medal, and the American Campaign Medal. In 2004, he was honored with a Commemorative Medal from the Federation of French War Veterans. After the war, Mr. Laugel worked for the General Services Administration in Belle Meade and Bayonne. Following his retirement, he worked as a clerk for the Newark law firm of Stryker, Tams and Dill.[2]*

Richard also shared a very special bond with his maternal grandfather, John Nelson. Mr. Nelson died at the age of eighty-six at his home in Kearny, New Jersey.  Clearly emotional when discussing his grandfather, Richard looked up to him a great deal. Mr. Nelson was a powerful role model for Richard, and was part of the reason he was motivated to join the military. John Nelson's obituary states the following about his military service:

> *He served in the Army during World War II with Patton's Third Army in Normandy, France. During the Battle of Metz, he was captured by the Germans in 1944. The Russian Army released him in 1945. He was honorably discharged with the rank of Corporal. He was a recipient of the Combat Infantry Badge, The Bronze Star, The Purple Heart and The Victory Medal.[3]*

---

[2] http://obits.nj.com/obituaries/starledger/obituary.aspx?pid=141294143
[3] http://www.theobserver.com/2012/05/obituaries-52/

3

Richard continues to grieve the loss of his grandfather, feeling he was one of the few people in his life that was consistent and stable.

Richard attended school in Kearny, New Jersey, graduating high school in 1997. Following graduation, Richard attended John Jay College. He was hoping to work in the criminal justice system, ideally in law enforcement. He attended for several years and was working toward his Bachelor's of Science. This plan was put on hold when Richard enlisted in the Marines two days after the terrorist attack on the World Trade Center. He signed up in September and began his service in February 2002. He was able to return to his education when his service was complete and received his Bachelor's of Science through the Peace Officer's Training Program (P.O.S.T.).

In February 2002, Richard was sent to boot camp in South Carolina. He remained there until May 2002. He was then sent to Okinawa, Japan for advanced training. Once this was finished, he was deployed to Korea and remained there for two months. He states this time was spent studying further advanced training techniques. He returned to the states to Camp Pendleton in California in September 2003, remaining there until he was deployed to Iraq in February 2004. The next several years were spent in and out of severe combat situations in the first responder unit of the 1st Marine Division in Iraq.  Mr. Laugel describes the first responder unit as being the group of men and women on the front lines who were the first to react when enemy fire began. This meant always having one ear open for the sound of combat, and being responsible for the safety of your unit, as well as others based on how quickly you reacted.

During his first deployment to Iraq, Richard spent time in Ramadi and Fallujah. He recalls this time as witnessing the most violence and experiencing the most frequent attacks during his time in the military. He remembers the sound of almost constant heavy machine gun fire along with artillery fire, and for his eight months there, feeling consistently unsafe. During this time, Richard was also involved in a roadside attack that left one Marine dead. In September 2004, Richard returned to Camp Pendleton in California and remained there for the next year.

Following his first experience in combat, Richard noticed things felt different when he returned to the states. He was more anxious and was having what he now knows were panic attacks; shortness of breath, heart palpitations, and extreme emotional discomfort. He remembers these attacks happening in response to loud noises of any kind, and any situation he perceived as a threat.

In September 2005, Richard extended his military contract and volunteered to return to Iraq. This time he remained in Fallujah for his entire eight month stay. Mr. Laugel remembers this deployment as easier than his first, but this likely due to the fact he was able to manage his reactions to what he was witnessing more effectively than during his first experience. He again recalls roadside bomb attacks and mortar fire, injuring and killing others around him. He was also involved in a vehicle crash in which his vehicle

4

rolled over during the crash. This accident resulted in Mr. Laugel suffering significant back injuries resulting in a seventy (70) percent disability rating from the VA.  When he returned to the states in May 2006, he felt lucky to be alive.

This feeling of luck was short-lived, however. Mr. Laugel states he "felt really weird" when he returned, different than the first term between combat. His general emotional discomfort had increased; he was more triggered by loud noises, was having nightmares about being at war, and always felt "on guard."  He felt cautious all the time and was consistently on the lookout for an immediate threat. Post-Traumatic Stress Disorder is characterized by the following symptoms:

> *The essential feature of Posttraumatic Stress Disorder is the development of characteristic symptoms following exposure to an extreme traumatic stressor involving direct personal experience of an event that involves actual or threatened death or serious injury, or other threat to one's physical integrity; or witnessing an event that involves death, injury, or a threat to the physical integrity of another person; or learning about unexpected or violent death, serious harm, or threat of death or injury experienced by a family member or other close associate (Criterion A1). The person's response to the event must involve intense fear, helplessness, or horror (or in children, the response must involve disorganized or agitated behavior) (Criterion A2). The characteristic symptoms resulting from the exposure to the extreme trauma include persistent re-experiencing of the traumatic event (Criterion B), persistent avoidance of stimuli associated with the trauma and numbing of general responsiveness (Criterion C), and persistent symptoms of increased arousal (Criterion D). The full symptom picture must be present for more than 1 month (Criterion E), and the disturbance must cause clinically significant distress or impairment in social, occupational, or other important areas of functioning (Criterion F).[4]*

Richard struggled with feelings of guilt at being home while others were still fighting. He also didn't understand why he survived and people with children didn't return home. He felt he didn't deserve to be at home, but was not able to go back to combat due to his back injury. He feels he would have returned if this were not the case.

Richard was able to get help through the Veteran's Administration for his back injuries. He had one surgery the summer after he returned, which afforded him some relief. ███
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

---

[4] http://www.mental-health-today.com/ptsd/dsm.htm

▬▬▬▬▬▬▬▬▬▬▬▬ and his veteran's benefits allowed him to purchase a small home in Lake Elsinore, California, where he lived alone.

Richard remembers these years as having "shut down" from the outside world. He went to work and performed well at his job, but he had very little contact with anyone outside of work. He did have some contact with fellow Marines he had known during his service, and could connect to these friends on occasion. He felt more comfortable alone, however, continuing to feel mistrustful of others and having fairly regular panic attacks and nightmares. His drinking increased during this time as well, drinking about ten beers daily at his worst. Richard knew there was something wrong, and suspected his symptoms were due to the experiences he had in combat and suspected he had Post Traumatic Stress Disorder (PTSD) but did not want to get help for fear it would look bad ▬▬▬▬▬▬▬▬▬▬▬▬.

In late 2011, Richard's back began to bother him again, and got progressively worse. At this time, he decided to leave his job, sell his home and return to New York to be near his family and treat his injury. He had felt very isolated for a long time and missed his grandfathers in New Jersey and New York. He had also been dating a woman who lived in Queens, New York and initially lived with her upon his return. After a few months, his relationship ended and Richard moved to the Bronx on his own. In February 2012, after he had relocated to the Bronx, he had a second surgery on his back for a herniated disc, which helped him significantly. He has had minimal discomfort since this time.

**CURCUMSTANCES LEADING UP TO THE CURRENT OFFENSE:**

When Richard returned to New York, ▬▬▬▬▬▬▬▬▬▬▬▬. He spent nearly a year recovering from his back surgery, isolating himself and drinking a significant amount. After months of seclusion, Richard decided he needed to make some changes. He chose to run a business and with money he had saved from his work ▬▬▬▬ ▬▬▬▬▬▬ and time in the military, and purchased a Laundromat in his community. He became absorbed in his work, and focused on making his business a success. He continued to be quite isolated, although his drinking had markedly decreased. He continued to have symptoms of PTSD, and tried to struggle through them on his own. For Richard, the most distinguishing characteristic of this disorder was consistently feeling under vague threat without any evidence to support this feeling, and social isolation.

In addition to the general symptoms of PTSD, Mr. Laugel describes classic symptoms of combat stress. These symptoms are specific to veterans who have been in combat and can often be more severe than other types of PTSD sufferers. Mr. Laugel described one instance that occurred while living in California involving fireworks. He was sleeping in his apartment and suddenly woke to the sound of what he experienced as gunfire. He grabbed his licensed firearm from his home that he carried ▬▬▬▬▬▬▬▬▬▬ and ran

6

out into the night in his underwear, completely under the assumption he was in Iraq and defending himself and his fellow marines from harm. After a few seconds of being outside, he realized exactly where he was, that he was not in combat and returned to his home. He was also experiencing nightmares containing images of combat and would wake up screaming and drenched in sweat. Restful sleep was elusive. In describing the reasons for traumatic reactions the combat, the Help guide describes the following:

> Post-traumatic stress disorder (PTSD), sometimes known as shell shock or combat stress occurs after you experience severe trauma or a life-threatening event. It's normal for your mind and body to be in shock after such an event, but this normal response becomes PTSD when your nervous system gets "stuck." Your nervous system has two automatic or reflexive ways of responding to stressful events:
>
> **Mobilization,** or fight-or-flight, occurs when you need to defend yourself or survive the danger of a combat situation. Your heart pounds faster, your blood pressure rises, and your muscles tighten, increasing your strength and reaction speed. Once the danger has passed, your nervous system calms your body, lowering your heart rate and blood pressure, and winding back down to its normal balance.
>
> **Immobilization** occurs when you've experienced too much stress in a situation and even though the danger has passed, you find yourself "stuck." Your nervous system is unable to return to its normal state of balance and you're unable to move on from the event. **This is PTSD**.
>
> Recovering from PTSD involves transitioning out of the mental and emotional war zone you're still living in and helping your nervous system become "unstuck."[5]

Unfortunately, Mr. Laugel did not receive help for his symptoms of PTSD. He was not always associating his struggles to his traumatic experience in combat, and therefore did not put together how treatment might benefit him. The symptoms he struggled with most were hyper-vigilance and a consistent feeling of being unsafe. These symptoms caused Mr. Laugel to feel depressed and suspicious, and may have contributed to the alleged actions for which he was arrested.

In 2015, Richard Laugel met his current wife, Tania Jackson, online. The two dated for several years and enjoyed a supportive, caring relationship. Tania describes Richard as quiet, respectful, polite and generous, and has never been concerned for her safety while in his presence. In fact, she feels that Richard is very protective of her and has been

---

[5] https://www.helpguide.org/articles/ptsd-trauma/ptsd-in-veterans.htm

available to her whenever she has needed something from him. Tania has two children from another relationship ages fourteen and seventeen, and reports that Richard has a positive relationship with both of them. When Tania and Richard established themselves as a committed couple, she began working with him in the Laundromat, and reports Richard ran his business efficiently and worked very hard.

Tania is aware of Richard's combat history and admires the service he has provided to his country. She is also aware of the issues Richard struggles with as a result of his combat history. She reports there were times when Richard would get very depressed and withdraw from her for several days at a time. They both would call this "the mood" and understood it was very challenging for Richard to reach out when he felt this way. She also reports Richard suffered from consistent nightmares, waking up in the night feeling anxious and upset. Tania and Richard were married in January 2017 and Tania states she is committed to Richard and loves him very much.

**SENTENCE RECOMMENDATION:**

Richard Laurel has faced several significant traumas in his relatively short life. Growing up with his parents, his father was a serious alcoholic who was physically abusive to his mother, Richard's sister and Richard. Although his parents separated when he was a teenager, Richard continued to spend time with his alcoholic father who he never felt safe with or protected by.

Growing up, Mr. Laurel did well in school and following high school graduation attended John Jay College, ███████████████████████████████████. When the attack on the World Trade Center happened in 2001, Richard felt a responsibility to protect his country and entered the Marines. From 2002 through 2006, he served his country during Operation Iraqi Freedom (OIF), deploying in aggressive combat for two tours. He would have continued if he had not suffered injuries to his back when his vehicle rolled over during this incident. When he returned to society, Richard was not the same person he was prior to his service. He describes many symptoms supporting a diagnosis of PTSD, and struggled for many years trying to manage these issues. 

Due to increasing issues with his back, Richard relocated to New York in 2012 and received treatment for his back at the Veteran's Hospital in New York. Following two surgeries, his back was much improved. At this time, he decided ███████████████ ███████████ and purchased a Laundromat in his Bronx community. He owned this business until his arrest in 2016. In 2015, he became involved with Tania Jackson, his current wife, who he married in January of 2017. At the same time he met his wife, Mr. Laurel began attending Degree University and is a few credits shy of receiving his Degree in Business Administration. He made the Dean's list throughout his studies at DeVry.

8

Following Mr. Laugel's arrest on or about March 12, 2016 on charges brought in New York State Supreme Court, Bronx County, he was held at the Vernon C. Bain Correctional Center (VCBC) in Bronx, New York. Upon entering this facility, he was evaluated by the mental health unit there and for the first time was officially diagnosed with PTSD. While incarcerated at VCBC, Mr. Laugel began taking two medications for his disorder, Remeron, a medication for major depressive disorder, and Visteril, a medication for anxiety. The combination of these medications were very helpful in reducing Mr. Laugel's depressive symptoms and reducing his nightmares. He does still suffer from some symptoms of anxiety, and states he tries to stay out of confrontations, which increases his anxiety and general distrust of others. Mr. Laugel did receive counseling once per month to help him understand his symptoms and how to manage them until his release from the New York City Department of Corrections on or about February 6, 2018. However, since his incarceration in federal custody, Richard is currently receiving medication but he has not received any counseling for his PTSD and he does appreciate the need for mental health intervention and how these services help to manage his impulsiveness and anger management.

Given all of Mr. Laugel's history of trauma and subsequent PTSD diagnosis, the defense respectfully requests leniency in his sentencing. Mr. Laugel was able to overcome the abuse he suffered as a young boy, graduated high school, and attended college at John Jay College of Criminal Justice for more than a year. He also enrolled in various criminal justice college courses while in the Marine Corps and ultimately obtained a █████ ████████████████████████. He enlisted in the Marines in 2001, feeling a responsibility to defend his country following the terrorist attacks of that year. This decision, one Mr. Laugel said he would make again today, left Richard forever scarred by the combat he witnessed and the lives of fellow Marines that were lost. He did all he could to re-enter society upon his return, entering the field of law enforcement, but was isolated and struggling for many years with the emotional pain of PTSD. On the surface, he did well in his attempts at integrating into society, but never felt a part of the world around him. He continued to struggle with the debilitating nature of PTSD up until the time of his arrest in 2016. At this time, Mr. Laugel had a mental health evaluation for the first time and received intervention for his condition. He is committed to continuing this treatment, as he now feels the direct benefit of support of counseling and the medication he takes.

Mr. Laugel served nearly two years in jail since the time of his initial arrest on New York State charges and has been in federal custody from on or about May 23, 2018 until the present. The defense is well aware of the serious nature of the charges against Mr. Laugel, but does not feel that the source of these behaviors, his diagnosis of PTSD, will be well treated within the prison system. Instead, Mr. Laugel will be among other men he knows have committed crimes and will consistently feel threatened for his personal safety. Mental health treatment requirements will be most beneficial for Mr. Laugel and

9

society as a whole. The Veteran's Administration has an intensive in-patient program for PTSD Mr. Laugel could enter upon his release. The program is described as follows:

> **Specialized Intensive PTSD Programs (SIPPs)**
>
> SIPPs provide PTSD treatment services within a "therapeutic community." Many programs are residential (live-in). Activities offered are social, recreational (relax), and vocational (work), as well as counseling.

- PTSD Day Hospitals (DH) are outpatient. They provide one-to-one and group treatment for 4-8 hours each visit. Patients come in daily or several times a week.
- Evaluation and Brief Treatment of PTSD Units (EBTPUs) provide PTSD treatment for a brief time ranging from 14 to 28 days.
- PTSD Residential Rehabilitation Programs (PRRPs) provide PTSD treatment and case management. The goal is to help the trauma survivor return to healthy living in the community. Stays at a PRRP tend to be 28 to 90 days long.
- Specialized Inpatient PTSD Units (SIPUs) provide trauma-focused treatment. Hospital stays last from 28 to 90 days.
- PTSD Domiciliary (PTSD Dom) provides live-in treatment for a set period of time. The goal is to help the Veteran get better and move to outpatient mental health care.[6]

The several options outlined here by the Veteran's Administration are all possibilities of treatment for Mr. Laugel once he is released from prison. These options are only open to Mr. Laugel, however, if his criminal record does not reflect any conviction higher than a B Felony. Mr. Laugel is interested and willing to attend residential treatment, as well as follow up treatment as needed for as long as it takes to feel in control of his PTSD symptoms. It would be unfortunate to deny him any of these treatment options in the future due to his criminal conviction history. Mr. Laugel does realize these issues were interfering in his life in negative ways, and that he must continue to address this disorder for as long as necessary.

In addition to specific treatment for PTSD, Mr. Laugel would also benefit from regular counseling by a trained professional in this disorder. The sooner Mr. Laugel can engage in treatment targeted for his specific symptoms and disorder, the more effective this treatment will be.

---

[6] http://veteransbenefitsinformation.com/ptsd/3509-ptsd-treatment-programs-in-the-us-department-of-veterans-affairs.html

**CONCLUSION**

The circumstances leading up to the current charges are worthy of consideration regarding Mr. Laugel's sentence. Mr. Laugel suffers from a myriad of social, physical and emotional issues, all of which have contributed to the trajectory of his life. The most significant of these issues is the severe PTSD he is diagnosed with as a result of his combat experience as a Marine in Iraq.

At present, Richard Laugel is motivated to make positive changes in his life. While he was in the care of the NYC Department of Corrections, Mr. Laugel was receiving intervention for the first time for his mental health issues but he has not received these services since being held in federal custody. Mr. Laugel is motivated to continue this treatment and increase his participation in therapeutic treatment once he is released. Ongoing services are available to him through the Veteran's Administration for as long as needed. The defense strongly believes that leniency in sentencing for Mr. Laugel is warranted given his history of trauma, his diagnosis of Post-Traumatic Stress Disorder following combat experience while serving his country as a Marine and his willingness to manage these symptoms through mental health treatment and medication.

We thank the Court for its consideration of this report.

Respectfully submitted,

/s/
Nancy Tricamo, LCSW
Mitigation and Sentencing Specialist