# LAW OFFICE OF
# TROY A. SMITH

Attorney at Law, PC

200 Mamaroneck Ave  
Suite 401  
White Plains, NY 10601

Main Line: (914) 358-1433  
Fax: (914) 358-5203  
Email: Troy@NYlawSmith.com  
www.ny-criminal-defense-lawyer.com

March 13, 2019

The Honorable Paul A. Engelmayer  
United States District Court  
Southern District of New York  
40 Foley Square  
New York, NY 10007

Re: <u>United States v. Richard Laugel</u>, 18-cr-443 (PAE)

Dear Judge Engelmayer:

 As counsel for Richard Laugel, I am respectfully submitting this memorandum in connection with his sentencing, which is currently scheduled for March 20, 2019 at 10:00 A.M. In addition to this memorandum, the defense respectfully requests that you consider the attached Mitigation Report prepared by the Defense Mitigation and Sentencing Specialist, Nancy Tricamo, LCSW, as well as letters of support from Mr. Laugel's wife, Tania Jackson-Laugel and his best friend, Dallas Miller, Sergeant Major (Retired, United States Marine Corps.) Mr. Laugel and I have read the Pre-Sentence Report [hereinafter "PSR"] and we agree there are no material factual inaccuracies in the PSR which would impact guideline calculations.

## **<u>Legal Principles Governing Sentencing</u>**

 Mr. Laugel pled guilty to Counts 1, 3 and 4 of a five count Information. Count 1 charges Mr. Laugel with destruction by means of a fire or explosive, and

attempted destruction of property in violation of 18 U.S.C. § 844(i).  Count One carries a maximum sentence of 20 years imprisonment; a mandatory minimum of five years imprisonment, a maximum term of lifetime supervised release; a maximum fine of the greater of $250,000 or, pursuant to 18 U.S.C. § 3571, or twice the gross pecuniary loss to persons other than the defendant resulting from the offense; and a $100 mandatory special assessment.  Pursuant to the plea agreement, the parties stipulated that Mr. Laugel's offense level for Count 1 (Group One) is 35.

     Mr. Laugel pled guilty to Counts 3 which charges him unlawful possession of firearms silencers in violation of 26 U.S.C. § 5861(d) and 5871.  Count 3 carries a maximum sentence of 10 years imprisonment; a maximum term of three years supervised release; a maximum fine of the greater of $10,000 or, pursuant to 18 U.S.C. § 3571, or twice the gross pecuniary loss to persons other than the defendant resulting from the offense; and a $100 mandatory special assessment. The parties stipulated that Mr. Laugel's offense level for Count 3 (Group 2) is 26.

     Mr. Laugel pled guilty to distributing and possession with intent to distribute alprazolam in violation of 21 U.S.C. § 841(b)(2), a lesser included offense of Count 4.  Count 4 carries a maximum sentence of 5 years imprisonment; a maximum term of three years supervised release; a maximum fine of the greater of $250,000 or, pursuant to 18 U.S.C. § 3571, or twice the gross pecuniary loss to persons other than the defendant resulting from the offense; and a $100 mandatory special assessment.  The parties stipulated that Mr. Laugel's offense level for Count 4 (Group 3) is 16.[1]

     The parties stipulated that the total offense level for Group One, Two and Three is 35.   There is a three level decrease for acceptance of responsibility and timely notice to the Government, under U.S.S.G. §3E1.1(a) and § 3E1.1(b).  This yields a Guideline Offense Level of 32 with a Stipulated Guideline Range of 121 to 151 months.

     18 U.S.C. §3553(a) calls upon this Honorable Court to impose a sentence sufficient, but not greater than necessary to comply with the purposes set forth in paragraph (2) of [3553(a)].

---

[1] The PSR indicates the correct offense level for Group 3 is 14 but it has no effect on the overall guideline calculation.

18 U.SC. §3553(a) sets forth various factors to consider in determining reasonable punishment including: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; and (2) the need for the sentence imposed (a) "to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense"; (b) to afford deterrence; (c) to protect the public, and (d) to provide for rehabilitation.

### History and Characteristics of Defendant

Mr. Laugel is thirty nine years old. This case represents his first felony conviction.

Mr. Laugel was born and raised in New Jersey. His parents separated in 1993 when Richard was about 14 years old. Mr. Laugel described his home life as quite turbulent. His father was a severe alcoholic who would frequently beat up his mother as well as Richard and his sister. This was the beginning of a life filled with trauma for Mr. Laugel.

Mr. Laugel had two male role models during his childhood, his maternal and paternal grandfathers, both of whom served courageously during World War II. Mr. Laugel's maternal grandfather was a Prisoner of War and was the recipient of the Combat Infantry Badge, Purple Heart and the Bronze Star.

It is no surprise that Richard enlisted in the United States Marine Corps just two days after the 9/11 attack on the World Trade Center. Mr. Laugel served two combat tours in Iraq. During his first deployment, Richard was part of the first responder unit of the First Marine Division in Iraq, the first group of Marines on the front line.

During his first deployment to Iraq, Mr. Laugel spent time in Ramadi and Fallujah. He recalls this time as witnessing the most violence and experiencing the most frequent attacks during his time in the military. He remembers the sound of almost constant heavy machine gun fire along with artillery fire, and for his eight months there, feeling consistently unsafe. During this time, Richard was also involved in a roadside attack that left one Marine dead.

Following his first experience in combat, Richard noticed things felt different when he redeployed back to the United States. He was more anxious and was having what he now knows were panic attacks.

In September 2005, Richard extended his military contract and volunteered to return to Iraq. This time he remained in Fallujah for his entire eight month stay. He again recalls roadside bomb attacks and mortar fire, injuring and killing others around him. He was also involved in a vehicle crash in which his vehicle rolled over during the crash. This accident resulted in Mr. Laugel suffering significant back injuries resulting in a seventy (70) percent disability rating from the VA.

Upon his return from combat, Richard struggled with feelings of guilt at being home while others were still fighting. He also didn't understand why he survived and people with children didn't return home. He felt he didn't deserve to be at home, but was not able to go back to combat due to his back injury. He feels he would have returned if this were not the case.

Upon his honorable discharge from the military, Mr. Laugel applied and entered the ▆▆▆▆▆▆ in Riverside, California in December 2006. He completed this training six months later graduating at the top of his class in the categories of academics, physical fitness and marksmanship. Following graduation, he obtained employment with the ▆▆▆▆▆▆ ▆▆▆▆▆▆ for the next five years.

Mr. Laugel remembers these years as having "shut down" from the outside world. He went to work and performed well at his job, but he had very little contact with anyone outside of work. He did have some contact with fellow Marines he had known during his service, and could connect to these friends on occasion (Attached Character letter from Dallas Miller). He felt more comfortable alone, however, continuing to feel mistrustful of others and having fairly regular panic attacks and nightmares. His drinking increased during this time as well, drinking about ten beers daily at his worst. Richard knew there was something wrong, and suspected his symptoms were due to the experiences he had in combat and suspected he had Post Traumatic Stress Disorder (PTSD) but did not want to get help for fear it would look bad as a ▆▆▆▆▆▆.

After serving as a ▆▆▆▆▆▆ for several years, Mr. Laugel's back condition became debilitating to the point that he was not able to perform his job to his satisfaction. It was at this time that Mr. Laugel decided to move back to the tri-state area to be closer to his family. Upon his return, Mr. Laugel had back surgery and he spent nearly a year recovering from this at which time he isolated himself and drank a significant amount. After months of seclusion, Richard decided he needed to make some changes. He chose to run a business with money he had

saved and purchased a Laundromat in the Bronx.  Mr. Laugel became absorbed in his work, and focused on making his business a success. He continued to be quite isolated, although his drinking had markedly decreased. He continued to have symptoms of PTSD, and tried to struggle through them on his own. For Richard, the most distinguishing characteristic of this disorder was consistently feeling under vague threat without any evidence to support this feeling, and social isolation.

In addition to the general symptoms of PTSD, Mr. Laugel describes classic symptoms of combat stress. These symptoms are specific to veterans who have been in combat and can often be more severe than other types of PTSD sufferers. Mr. Laugel described one instance that occurred while living in California involving fireworks. He was sleeping in his apartment and suddenly woke to the sound of what he experienced as gunfire. He grabbed his licensed firearm from his home that he carried [REDACTED] and ran out into the night in his underwear, completely under the assumption he was in Iraq and defending himself and his fellow marines from harm. After a few seconds of being outside, he realized exactly where he was, that he was not in combat and returned to his home. He was also experiencing nightmares containing images of combat and would wake up screaming and drenched in sweat.

In 2015, Richard Laugel met his current wife, Tania Jackson, online. The two dated for several years and enjoyed a supportive, caring relationship. Tania describes Richard as quiet, respectful, polite and generous, and has never been concerned for her safety while in his presence. In fact, she feels that Richard is very protective of her and has been available to her whenever she has needed something from him. Tania has two children from another relationship ages fourteen and seventeen, and reports that Richard has a positive relationship with both of them. When Tania and Richard established themselves as a committed couple, she began working with him in the laundromat, and reports Richard ran his business efficiently and worked very hard.

Tania is aware of Richard's combat history and admires the service he has provided to his country. She is also aware of the issues Richard struggles with as a result of his combat history. She reports there were times when Richard would get very depressed and withdraw from her for several days at a time.  They both would call this "the mood" and understood it was very challenging for Richard to reach out when he felt this way. She also reports Richard suffered from consistent nightmares, waking up in the night feeling anxious and upset. Tania and Richard were married in January 2017 and Tania states she loves him very much but she

acknowledges that she is unclear about the long term vitality of their marriage.

Unfortunately, Mr. Laugel did not receive help for his symptoms of PTSD. He was not always associating his struggles to his traumatic experience in combat, and therefore did not put together how treatment might benefit him. The symptoms he struggled with most were hyper-vigilance and a consistent feeling of being unsafe. These symptoms caused Mr. Laugel to feel depressed and suspicious, and may have contributed to the alleged actions for which he was arrested.

## CIRCUMSTANCES LEADING UP TO THE CURRENT OFFENSES

### Count 1-The explosive device

With respect to Count 1, Mr. Laugel and ▮▮▮▮▮, the complaining witness, were neighbors that resided in the same building. Mr. Laugel did not associate with ▮▮▮▮▮ He described him as a gang member and a drug dealer.[2] Days prior to the charged offense, Mr. Laugel indicates that he had a verbal altercation with ▮▮▮▮▮ and his associate over a parking spot. ▮▮▮▮▮ escalated the verbal argument by brandishing a firearm at Mr. Laugel and threatening to kill both him and his wife. Mr. Laugel explains that he just snapped as he was in a very bad place mentally at the time and that his untreated PTSD clearly played a role in his actions.

It was at this time that Laugel constructed a small rudimentary explosive device that he had learned how to build from information he had read on the internet in addition to his military experience.[3] In constructing the device, Laugel indicated he used "smokeless black powder" as the main accelerant inside of the

---

[2] Much of ▮▮▮▮▮ nefarious background is corroborated in the materials received in Discovery in the original state case and also provided by the Government pursuant to Rule 16 Discovery.

[3] While deployed to Iraq and Afghanistan, Laugel witnessed first-hand the damage that different sized IED's could inflict and that the majority of the IED's used by the insurgents were made out of old 155mm artillery rounds capable of causing extensive damage.

device. [4]   Further, Laugel admits to remotely detonating the device while driving behind the complainant's vehicle.   Fortunately and most importantly, no one was injured by Mr. Laugel's actions.  Further, the reported damage caused by the device were that a tire blew out on ▒▒▒▒▒▒ vehicle; the vehicle's airbags deployed and; there was a dent on one car parked in the immediate area.

Laugel was arrested three days later on March 5, 2016.  He was charged and indicted in the Bronx Supreme Court (Indictment No. 919/2016) where he was remanded to the custody of the New York City Department of Corrections and incarcerated for 23 months.

In February 2018, the Bronx District Attorney's Office indicated that they had lost contact with ▒▒▒▒▒▒ and that he had been uncooperative in the prosecution of the case.  At this time, the Court changed Mr. Laugel's bail conditions from remand status to $100,000.  Mr. Laugel was able to post bond approximately one week later.

**Count 3-The Firearms offense**

On May 16, 2018, law enforcement agents obtained a search warrant based on the allegations in Count 4.  On May 22, 2018, law enforcement agents executed the search of Laugel's residence and recovered Mr. Laugel's personal collection of firearms and firearm parts.

First, it is important to note that the seized cache of firearms were collected and built by Mr. Laugel over a period of many years of being an avid gun collector.  It should come as no surprise that Mr. Laugel, a United States Marine, would have a passion for firearms.  This was his passion, his hobby, much like a baseball card or stamp collector.

---

[4] During the execution of the search warrant at Laugel's residence, the Government recovered Tannerite, a more powerful explosive than the accelerant used in the instant offense. Tannerite is a highly explosive material that is used recreationally in shooting targets that explode on impact.  Laugel legally purchased this at a sporting goods store.  Tannerite has been linked to a number of high profile bombings in recent past.

As for the silencers which Mr. Laugel pled guilty to and accepts responsibility, Mr. Laugel indicates he purchased a silencer kit on a legal website called "Form1builder.com."[5] Using the kit, Mr. Laugel describes that in order to complete the kit it was necessary to drill holes through several provided cups known as "baffles" and one hole on the end caps. Once the holes were drilled through the baffles and the one end cap, Laugel indicates that the kit could potentially be used as a silencer or suppressor.

As for the registration of the silencer, Laugel explains that, generally, when an individual purchases a completed silencer from a firearms dealer, the dealer is responsible for filing the Form 1 with the ATF. However, in the case of a "homemade" silencer kit, once the silencer is complete, Laugel indicates that the purchaser of the kit is responsible for the filing of the Form 1 with ATF along with the $200 fee. However, according to Mr. Laugel the problem with the "homemade" kit that he completed was that just because he had drilled holes in the cups and the end cap, it did not necessarily mean that the device functioned to his satisfaction as a "silencer." Laugel indicates he did not want to pay and submit an application for a device that he did not believe properly functioned even though he recognizes in hindsight that he had a legal requirement to complete the Form 1 and register the "homemade" silencers.

Additionally, at the time of the search of Laugel's residence, two Glock pistols with defaced serial numbers were recovered from his garage. Mr. Laugel acknowledges there is a 4 level guideline adjustment for possession of an altered or obliterated serial number. However, Mr. Laugel wishes to inform the Court that he did not intentionally deface or obliterate the serial numbers. He describes that the seized firearms were comprised of mixed parts and that each one of these parts could be legally purchased online on websites such as Ebay. Laugel indicates that while these parts may have serial numbers on them, that the serial numbers do not pertain to any federal database as the guns were never required to be registered since they were built using different parts and not purchased as a whole. Mr. Laugel likens this to a Vehicle Identification Number (VIN) on an automobile in that the VIN number itself is registered with the DMV but the individual parts of

---

[5] "Form 1"is the document that must be filed with the ATF in order to legally own a silencer or suppressor. According to Mr. Laugel, the website markets the kits as a "Solvent Trap Kit." However, according to Laugel, it is common knowledge that these kits will be used to be converted as silencers, hence the name "Form1builder."

the vehicle are not registered.  Therefore, if you built a car at home using all different parts there would be no VIN number assigned to it because it was not purchased from a dealership.

Lastly, Mr. Laugel wishes to address the Government's contention that a "grenade launcher" was seized during the search of his residence.  While Laugel agrees this item was seized, he contests that the launcher was not a "Grenade Launcher" but was a 37mm "Flare Launcher" which can be purchased legally online in New York.  According to Mr. Laugel, the law states that this launcher is completely legal so long as it is not used to launch any "anti-personnel projectiles" from it such as bean bag rounds or tear gas rounds neither of which were found in Laugel's possession.

**Count 4-Possession and Distribution of Alprazolam**

Mr. Laugel was addicted to Xanax, as it helped him greatly with his anxiety and panic attacks.  He reports abusing the drug often multiple times a day over a period of years.  He would ingest the drug in pill form and at times he would chop it up and snort it.[6]

Mr. Laugel reports that he first learned how to make Alprazolam, the generic form of Xanax, on his own as his addiction was expensive and he saw it as a way of saving a good deal of money.  He learned how to manufacture the drug by studying on line videos.  He ultimately began to manufacture and distribute the Schedule IV controlled substance as he was in dire financial straits with the closure of his Laundromat business.  Further, Mr. Laugel also chose to manufacture alprazolam as he viewed it as the type of drug that would not ruin people's lives.

---

[6] According to the PSR, when Laugel was arrested in September 2012 for driving under the influence, a baggie containing a white powdery substance believed to be cocaine was recovered from Mr. Laugel's person.  Mr. Laugel reports this substance was actually Alprazolam which he had broken down into powder for his own personal use.  Further, according to the PSR, Mr. Laugel was convicted of the offense of Driving with Ability Impaired.  Pursuant to New York Vehicle and Traffic Law §1192(1), Driving with Ability Impaired is a criminal violation and is not a crime. However, pursuant to U.S.S.G §4A1.1, Mr. Laugel will still receive one criminal history point for this offense.

## THE NEED FOR THE SENTENCE TO PROVIDE FOR REHABILITATION

Mr. Laugel respectfully requests this Honorable Court recommend to the BOP that he be incarcerated in a facility that can adequately provide treatment and counseling for his PTSD. His PTSD had essentially gone untreated for the better part of the last three years. From March 2016 until February 2018, Mr. Laugel was incarcerated at the Vernon C. Bain Center (AKA "the boat"), a New York City Department of Corrections jail that is a floating barge located in Bronx County. The conditions at this facility under ordinary circumstances are horrendous but it is sad to say they were better than the deplorable conditions that he had to undergo for the last several months at the Brooklyn Metropolitan Detention Center. Mr. Laugel describes the MDC as having limited heating and electricity for several weeks. Further, Laugel describes that both he and his bunkmate were sick with influenza. For days, Laugel sought medical attention but his pleas fell on deaf ears. He indicated that even though he felt better after a few days, his bunk mates condition deteriorated and Laugel had to beg for his bunk mate to finally be treated as he was concerned for his well-being.

To make matters worse, Laugel was originally being held at the Manhattan MCC following his May 2018 arrest but was moved to the MDC in the days about one month following his guilty plea. Prior to his transfer, Laugel had a positive influence at the jail volunteering as a GED tutor and a suicide prevention assistant. Using his many skills to effect a positive change had a profound effect on his overall mental health. However, without reason, the BOP moved Mr. Laugel to the MDC where he has been unable to engage in these positive programs. To the credit of the Government, they made good faith efforts to lobby the BOP to move Mr. Laugel back to MCC. However, this request was denied.

To further aid in his rehabilitative efforts, Mr. Laugel greatly desires to receive counseling for his PTSD, to which he has received none during his entire period of incarceration. In addition to therapy, Mr. Laugel acknowledges the need to treat his condition with proper medication. He reports that while he was at the MCC, he would be forced to take his medication in the middle of the day. Laugel report that he would fall asleep during the day and he would often wake up in the middle of the night unable to get back to sleep. When he discussed this issue with the medical staff, he was told there was nothing that could be done about the time he was given the medication so he stopped taking the medication. Mr. Laugel reports that when he was moved to MDC Brooklyn he put in a request to see the

doctor regarding this issue and was given a prescription that allows him to take the medication himself as needed.

As stated above, 18 U.S.C. §3553(a) calls upon this Honorable Court to impose a sentence sufficient, but not greater than necessary to comply with the purposes set forth in paragraph (2) of [3553(a)].

In <u>Gall v. United States</u>, 552, U.S. 38 (2007), the Supreme Court advises that the sentencing guidelines are "the starting point and initial benchmark but are not the only consideration." The sentencing Court should consider all of the factors of 18 U.S.C. § 3553(a) and then determine a "reasonable sentence" under all of the factors being considered. If a non-guideline sentence is deemed to be reasonable than the Court must determine the extent of the deviation.

While the guidelines are an important consideration, as the Second Circuit noted in <u>United States v. Cavera</u>, 550 F.3d 180, 180 (2d Cir. 2008):

> "Based on the unique facts of a particular case, austere adherence to the averages and generalities of the Guidelines can be unjust and contrary to reason. . . No chart or numbers will ever fully contemplate, quantify and cipher the endless variations of human experience. While it might provide a normalizing force in sentencing, we cannot, with a system of points and categories, reduce justice to a universal formula."

## **CONCLUSION**

Mr. Laugel respectfully requests this Honorable Court recommend to the Bureau of Prisons that Mr. Laugel be incarcerated at Allenwood Low Federal Correctional Institution. However, Mr. Laugel's placement in a low security level institution may not be plausible given the PSR's indication of a pending case in the Bronx. According to the PSR, the case originally prosecuted by the State of New York is still pending and that there is still an active bench warrant that was issued on May 29, 2018, one week after Mr. Laugel was placed in federal custody.

That being said, the undersigned has been advised by the Assistant District Attorney handling the Bronx case that on March 13, 2019, the Court dismissed the open indictment and the bench warrant. Further, the undersigned spoke previously with Probation Officer Kapitansky that when the Bronx indictment was dismissed

and the bench warrant vacated that he would file an addendum to the PSR to reflect the above.

      A resolution of this issue is critical to Mr. Laugel's placement within the Bureau of Prisons. According to Mr. Laugel, having this issue resolved favorably in the PSR will give him a base security score of 10 points making him eligible to be assigned to a low security level facility such as Allenwood Low Federal Correctional Institution. However, with the PSR reflecting a detainer for the open Bronx case, Mr. Laugel's base security score jumps up an additional 7 points meaning he would no longer be eligible for a low level security facility.

      In concluding, it has been said that laughter is the best medicine. In Command Sergeant Major (Retired) Dallas Miller's letter to the Court, he writes of Mr. Laugel's sense of humor that is remembered so fondly by many of his peers. Mr. Laugel certainly has used his sense of humor to help him through these most difficult of times. By way of example, Mr. Laugel met with the Government several months ago near the Christmas holiday season to discuss concerns regarding Mr. Laugel's intent in possessing a cache of firearms at his residence. Mr. Laugel allayed the Government's concerns in explaining that he is a Marine; that Marines love guns; it was his hobby and that he had no intent to ever use it for other reasons. Mr. Laugel is well aware that he will not be permitted to own firearms again and that he is going to need to find a new "hobby" upon his release from custody. As a parody, Mr. Laugel discussed being inundated with mail each year with Christmas holiday photo cards from family and friends of their children and beloved pets. Mr. Laugel asked the Government at the meeting if the ATF agents could please send him a holiday photo card of his beloved collection. To say that everyone in the room found this to be hilarious would be an understatement. It is this great sense of humor that will help Mr. Laugel through this difficult journey.

The defense thanks the Court for its careful consideration in arriving at an appropriate sentence for Richard Laugel.

                                  Respectfully submitted,

                                    _/s/ Troy A. Smith_____

                                  Troy A. Smith, Esq.

cc:   Jacob Warren
       Assistant United States Attorney (By electronic mail)

       Alison Moe
       Assistant United States Attorney (By electronic mail)